I understand the oralists have a complicated set-up that you are proposing. Mr. Watkins, you want to reserve two minutes, is that correct? Yes, Your Honor. Okay. You have a minute to get set up. You may proceed when you're ready. Before you do, my law clerk and I have been having a fight for about a week as to how to pronounce L-E-A-D-E-N-H-A-L-L. Your Honor, I understand it's Leadenhall as in the element with the PB symbol, lead. Good, thank you. I won the argument. Congratulations. Thank you, Your Honor, and may it please the Court. Jonathan Watkins on behalf of Appellants Advantage Capital and Mr. King. By freezing assets in which plaintiff claims no lien and no equitable interest, the district court strayed from the Supreme Court's clear holding in Grupo Mexicano and exceeded its authority under Rule 65. Here, frankly, the application of Grupo Mexicano is straightforward. Leadenhall made loans to four special purpose vehicle borrowers. Naturally, those borrowers were obligated to repay those loans. Well, so they've also said that the guarantors have assumed the obligation to secure sufficient collateral. What would be your response to that? The response to that, Your Honor, is that the guarantee is unsecured. They have guaranteed the obligations, but they have pledged no collateral of their own as security. Okay, so the obligations, the guaranteed obligations under the guarantee agreement, that's defined as the obligations as defined in the LSA, right? Yes, Your Honor. Okay, so let's look at the meaning of what's in the LSA. The LSA defines collateral not as specific items of property, but as all borrowers' rights, title, and interest to all assets of the borrower, with some exclusions that don't seem to apply. And then the LSA specifically says that the collateral agent can file statements securing property, and they can describe it as the property being secured as all assets or all personal property of the borrower. So as to the borrowers, there's no list of these are the items I'm posting as collateral. It's anything and everything they own, right? Right, Your Honor. And the guarantors step into the shoes of the borrowers under this agreement. It's an absolute, unconditional, and continuing guarantee of not only payment, but, quote, of all of the guaranteed obligations, which include the willingness to post as collateral any and all property and assets of the borrower. So why did the guarantor not step directly into that position and have any and all of their assets and property count as collateral and therefore making the guarantees effectively secured? Well, Your Honor, first, pledging collateral is not an obligation. Collateral is pledged, hereby pledged, under Section 2.15 of the LSA. Second, yes, all assets of borrowers are pledged as collateral, and that's exactly what the LSA says. Nowhere does it say the guarantors need to pledge their assets. The way it works under the UCC is the – So the pledging of the collateral is not an obligation of the borrowers? Not an obligation of the borrowers, no. It is hereby – So the loan agreement would have gone forward without the collateral being posted? No. The LSA itself, by operation of the LSA itself, the collateral is pledged. Okay. But it's not an obligation of the borrower to post – to pledge the collateral? That's exactly right. It secures the obligations of the borrowers. That's what it says in Section 2.15. It secures the obligations. So the way it works is, obviously, money is loaned, and then an obligation is to repay that money back. That's the core obligation. Then, as security, hey, I'm really going to pay you back, I promise. Like in a mortgage, you post your home as your collateral. The posting of the collateral happens under 2.15 of the LSA. It happens. It hereby is done as a matter of contract. That secures the performance of the obligations. The guarantors then guaranteed – offered a guarantee, but that guarantee is unsecured. There are things, such as secured guarantees, where a guarantor might pledge some assets of its own as collateral. But that is not what this guarantee is. The guarantors pledge absolutely no assets of their own as collateral. LevinHall filed UCCs, which are in their record. They go only to borrower's assets. There's no coincidence of that. LevinHall and the district court both have been clear that LevinHall's security interest is limited to the borrowers and not the guarantors. They have a security interest in borrowers and not in the guarantors. What's the relationship between the guarantors and the borrowers? The guarantors are the ultimate parents of the borrowers, Your Honor. Does that matter in terms of the arguments you're making now and the issue for us? I don't believe it does, Your Honor. It might matter if there were an argument about Pearson and Corporate Vale or so on, but no. They're distinct legal entities. The four SPV borrowers entered into an agreement that pledged their collateral. The guarantors entered into a separate agreement that pledges absolutely no asset whatsoever of their own. And neither LevinHall nor the district court has argued to the contrary in terms of whether there's a security interest in any asset of the guarantors. In terms of – LevinHall does argue that there is in the LSA an obligation to true up, to make up some collateral deficiency. They cite four provisions for that, two in Section 5 and two in Section 7 of the LSA. None of them impose any affirmative obligation whatsoever on the borrowers or to the guarantors. The two obligations in Section 5 are actually negative. They say that borrowers shall not do certain things on pains of other things in the LSA, naturally. The two sections in Section 7, what they do is they define what a borrowing-based deficiency is, something that was contemplated, and they say what happens if there's a borrowing-based deficiency. And what happens? There's an event of default. If it's uncured, there's the next level of event of default. If that's uncured, there's acceleration, and the accelerated debt is immediately due and payable. No mention whatsoever of pledging make-up collateral. Nothing of the sort. No word of it in the complaint whatsoever. No word of it in the application. It's no coincidence that LevinHall did just that. It noticed events of default. It accelerated its debt $609 million, which is different than the alleged $351 million collateral deficiency. $609 million is one thing. Sorry, am I correct that none of the guarantors' frozen assets at issue were part of the collateral originally held by the borrowers? That's exactly right. The guarantors' Can I ask also, were there any assets or are any of the assets proceeds from that collateral? There are no allegations that any of the assets I didn't ask that question. I asked if any of the asset proceeds were from that collateral. Any of guarantors' assets or proceeds from collateral? No, not to my knowledge, Your Honor. There's been no allegation, no evidence, not to my knowledge whatsoever. Okay. One of the things that I think is interesting about this case and may be part of why we're trying to put a square peg into a round hole is the suggestion that there was some sort of impropriety or collusion or attempt at trying to get around obligations through gamesmanship. I think your position would be that this is not the appropriate manner to try and address this, and we shouldn't be liberally interpreting doctrine as opposed to secured and unsecured on this. But can you give me a response for where you think there are appropriate mechanisms for handling the kind of impropriety that the colleagues on the other side suggest is going on? They're basically suggesting that this is all a complicated shuffling around of money so that people don't have to pay them what they're owed. Yes, Your Honor. I see my time is up. May I respond to that? Remember, it's our time. You're out there for as long as we need you. Okay. Thank you, Your Honor. Exactly. My colleague on the other side has suggested fraud, but anyone can make suggestions of fraud to freeze it. I'm going to ask the question again. I'm not trying to figure out whether there was fraud or there was not fraud. I'm asking where the doctrine as you understand it accounts for how we address any fraud or impropriety that was happening. I think you would say we don't do this by stretching secured versus unsecured and applying it in a different way. Where do we deal with it? How do we deal with it? First of all, fraud is not before the court because it wasn't the basis of the application. Completely understood. For fraud to be relevant, it needs to state an equitable claim for relief. They only bring a claimant law standing in fraud. They only seek money damages on fraud. So Dong v. Miller, for example, which the district court relies on, differentiates between a fraud claimant law and a fraud claim inequity. You need to bring an equitable claim for relief. They're arguing that their requests for equitable relief were sufficient, and you disagree. So tell me what more would have been required and how we draw the line. Well, they argue that the request for equitable relief that's sufficient is to enjoin future violations of contract. So that has nothing to do with the fraud claim whatsoever. So that's not sufficient for different reasons, but it has nothing to do for sure with any allegation of fraud. There is no equitable remedy. What they could have done, they could have identified a particular fraudulent transfer, sought rescission, equitable trust, pardon me, equitable lien, construct trust. There are scores of cases that do that, and then courts have the authority under Rule 65 in appropriate circumstances to freeze those particular assets, the subject of those claims. But no one has done that here. They haven't said that these assets were secreted, we've identified them, we seek to rescind those transactions, we want a constructive trust, we want an equitable lien. They haven't done any of those things. They've moved on a contract claim and lobbed allegations of fraud in the background. Now, in terms of the doctrine, Grupo Mexicano has dealt with this precisely, exactly this. Even faced with allegations of fraud, including the debtors' use of sophisticated strategies to avoid paying their creditors, courts have, quote, no equitable power to restrict a debtor's use of his property before judgment, period. Justice Scalia, writing for the Court there, also underscored the point by invoking Joseph Story. Hard was the case of bond creditors whose debtor devised away his real estate, but a court of equity can give no relief. The Court has dealt with this. Allegations of fraud cannot expand the scope of the Court's authority because it is limited to the scope of the judicial, pardon me, the equitable authority of the English High Court of Chancery in 1789. And allegations of fraud, particularly fraud sounding at law, could not invoke the Court's equitable jurisdiction, nor do equitable sounding arguments in papers. Equitable claims do. Equitable claims for relief that go to particular assets. Isn't there a fraudulent transfer claim in this case? There's a fraudulent transfer claim in the amended complaint, not in the complaint. Not in the complaint. It's a subject of this. Okay. I thought the amended complaint was filed prior to the issuance of this order. It was not. It was filed not only after the issuance of this order. It was filed after ACAP moved to modify the order. Okay. Okay. But it has been, it is now the operative complaint or it is not yet? It is now the operative complaint. It is the subject of a motion to dismiss, including on all the fraud claims. The fraudulent transfer there has nothing to do with borrowers or guarantors' assets or any of these things or these SPVs. It has to do with a JARM loan and a, it is an entirely different creature that has nothing to do with this. Now, if they had moved for, applied for relief based on a then nonexistent claim for fraudulent transfer with respect to those JARM loans, identified those assets and sought preliminary equitable relief with respect to those assets, perhaps the court would have been authorized under Rule 65. But that's not what has happened here. It's not properly before the court. It doesn't identify any assets. They haven't applied for relief on it. They don't seek equitable relief with respect to particular assets that's subject to that amended, belated fraudulent transfer claim. Can I just go back to my first question for a moment? I just, you're telling me that the obligation to offer as collateral all personal, all property, it does not extend to the guarantors. Is that because it's not an obligation? It's not an obligation. It's exactly so. Okay, so I'm reading the definition of, hang on, of obligations under the LSA. Obligations means with respect to each borrower the performance of all of the terms, covenants, and agreements on the part of such borrower to be performed under this agreement. And the agreement is not a short one. It is not. And it includes this provision that a collateral agent can file a notice that says everything the borrower owns is collateral. And it includes those other provisions we talked about earlier. I'm trying to understand how if that's the definition of the borrower's obligations, and it says the obligations, that term is defined to mean everything in this agreement. Okay. And the guarantor's obligations is defined to include all of the borrower's obligations. Right. I'm having trouble understanding why the collateral issues are not, quote, unquote, an obligation of the borrower. Two things, Your Honor. I think, first, it's not an agreement or an obligation of the borrower to pledge collateral. It's a term. It says that we hereby pledge. It says the performance of all of the terms. That's a term of the agreement, right? Saying that we hereby pledge, it is. It's a term. It's in the agreement. It is pledged by operation of law under the agreement. Okay. I'm just. We can move on from that.  But the second point is to the extent the collateral agent is allowed to file UCCs, which they did, on borrower's assets, even if the guarantor stepped into the shoes of the borrowers and said, yes, you can file UCCs as to borrower's assets, wonderful. No, as to guarantor's assets. That would be the shoes. Well, whose assets they can be filed on behalf of aren't the shoe. They are if the term of the agreement requiring that all assets of the borrower are collateral, then that term, which is an obligation, then becomes an obligation of the guarantor under the guarantee agreement. Your Honor, respectfully, there is no precedent anywhere in the law whatsoever, and this is a fundamental part of secured lending, that could change which assets are the subject of an obligation. And just because you're stepping into the shoes, a contractual shoes, you don't change the assets. I understand your argument. You would just strike out the word borrowers and put in the word. There's no precedent for that. I thank you. I understand your argument, counsel. Okay. Thank you. We'll hear from you on rebuttal. And, Mr. McCarthy, you have one minute. Good morning, Your Honors. May it please the Court, John McCarthy, on behalf of the defendant appellants in the consolidated appeal. I really just reserved my time in case Your Honors had any questions, but there were a couple of things I wanted to add to what briefly— You have 48 seconds, sir. So I would say, Your Honors, that Grupo Mexicano, in terms of the complicated shuffling that Your Honor referred to, specifically says that's why we have bankruptcy laws and that's why we have fraudulent transfer laws. It doesn't make the court of equity—the court doesn't have the equitable power to stay pre-judgment. And I would also point out that the guarantee in question is a provisional guarantee and that they have to prove that it's triggered. And otherwise, I rest on what we said and what Mr. Watkins has said. Thank you so much. Thank you, Your Honors. Thank you. Congratulations. I like this thing. Good morning, Your Honors, and may it please the Court. Lee Nathanson for the Leadenhall appellees in this case. Your Honors, this appeal is an attempt by ACAP, which is a co-defendant that is not enjoined by the preliminary injunction issued in this case, to strip assets from the entities that are bound by that injunction before Leadenhall can obtain a judgment against either of these parties. Now, the rule that ACAP would have this court adopt is one that would allow a party to render a secured credit or unsecured simply by abstanding with the security. Grupo Mexicano—  Is that not part of the risk one undertakes when conducting business, that that's going to happen and it's on you to make sure that you have contracts and arrangements and protections in the event that that does occur? It absolutely is a risk, and the contracts here mitigate against that risk, as does the law of equities here. So the contract, as Judge Merriam pointed out, has many provisions about posting of collateral and also the replacement of collateral. This is a loan and security agreement whereby the borrowers and the guarantors were permitted to borrow funds in a variable amount, and if they borrowed more, they would have to post more collateral. If they paid some back, they could take some collateral out. This was a living credit facility. And so, of course, the LSA has obligations to continue posting collateral. The guarantors undertook that obligation as well as the borrowers, and I think the Court pointed out that this is a rather unusual guarantee. This is not your mom signing your lease, co-signing your lease and undertaking a payment obligation, but nothing else. This is an obligation of performance, including the borrower's obligations— Okay, so he was saying, and I don't want to put words in his mouth, and I'm sure he can correct me, that this is run-of-the-mind language and that us interpreting it the way that we have been hypothesizing would be unprecedented. Is that wrong? That's wrong. Okay. It wouldn't be unprecedented, and there are a number of cases post-Grupo Mexicano that set a precedent for identifying—well, not having to identify specific assets, as the Gucci case from this Court makes clear. You don't have to identify specific assets at the time of a turning point. Okay, so I guess the specific question is the uniqueness of the language in the contract. I would say it's unusual. It's not unprecedented. It's unusual in the sense that the rule that the Court properly espoused here, which is consistent with Grupo Mexicano, would not open the door to every guarantor having an injunction issued against its assets in the case that the borrower absconds with the security. But that is because there's a specific—there's something peculiar about it. Yes, yes. And what's peculiar is the performance guarantee. The guarantors—and let me just point out to a point that Judge Sack raised earlier, which is related to this. This is also an unusual situation where the guarantors are not independent from the borrowers. That is, the affiliation between the guarantors and the borrowers is relevant in this case, not because it's a prerequisite or a requirement, but because it shows that the guarantors were indeed willing to, in this case, step into the shoes of the borrowers in a way that a run-of-the-mill guarantor is not typically doing. The guarantors were the entities that were benefiting from the LSA. The borrowers are special-purpose vehicles that are controlled and created by the guarantors and set up to do one thing, which is hold the collateral that was supposed to be Leadenhalls. Grupo Mexicano—all Grupo Mexicano says is it applies the equitable limitations of what the court can do in terms of issuing a preliminary injunction to the secured creditor context. It doesn't say anything about the scope of relief that a secured creditor like Leadenhall can get, and it also doesn't say that a secured creditor context or a security interest is the only type of equitable interest that can give rise to this type of preliminary injunction. And, of course, we know that's not true. In the Gucci case, the court enjoined assets on the basis of Lanham Act claims where the assets enjoined was simply profits of allegedly infringing conduct, in other words, money that the plaintiff said should have been theirs because absent the infringement, those would have been the profits that the brand holder was entitled to, but rather the profits went to the defendant. That's exactly what happened here. Leadenhall lent $600 million to the borrowers and guarantors, and that money went somewhere. It did not apparently go to purchasing and holding the collateral that was meant to secure the investment. And so the court here properly looked outside of the bounds of Grupo Mexicano because we are talking about a secured creditor with an equitable interest in having $600 million worth of collateral there in the event that the loan was defaulted on. And when that default happened, that collateral wasn't there, so the court exercised its discretion to enact a reasonable measure to enjoin assets with a strong nexus to the equitable interest that Leadenhall had, again, which is an interest in making the borrowers and the guarantors use their assets to purchase collateral and put them in the facility. And that relief is requested in both the original complaint and the amended complaint. Judge Merriam is correct that the amended complaint was considered on ACAP's Rule 59 motion to modify the preliminary injunction here, and the court did rely on equitable relief sought in that complaint, such as a fraudulent transfer claim. But it also relied on the equitable relief that was sought in the original complaint, which included an injunction against further violations of the contract. And further violations of the contract here means more than just failure to repay. It means that the parties need to be held to their obligations, and this includes the guarantors, of making sure that collateral is posted and available for Leadenhall in the event of a payment default. And that relief was asked for in the original complaint. There's also an unjust enrichment claim in the original complaint, which is undisputedly an equitable claim and gets at exactly this issue. If Leadenhall's $600 million was meant to be used in a certain way here to purchase assets that were then going to secure that investment, and they were used in a different way, that is money that was Leadenhall's money that was earmarked for a certain purpose. The security is the equitable interest that Leadenhall has, and both the guarantors and the borrowers are responsible for that obligation. One other point. I'm sorry, counsel. I'm going to ask you about the unjust enrichment claim for a minute. That is an equitable claim. But when the district court was ruling on the initial preliminary injunction, the court noted that you only need to find a likelihood of success on one count in order to issue the injunction, and the likelihood of success that what the district court hung its hat on was the breach of contract claim, right? Does that matter? Are we really permitted to consider the existence of the unjust enrichment claim if that was not the count on which the court found a likelihood of success sufficient to justify the injunctive relief? It matters, but it's not necessary. It's something that the court can consider, but it really doesn't need to. My colleague pointed out the fact that the court should not be considering allegations of fraud. We think that those allegations are relevant because this is an equitable consideration of the court, but they're not relevant, we agree, to the findings that were the predicates of the preliminary injunction here. That injunction was predicated on contract claims. But what is relevant and really involves the same set of facts is breach. The court found that there was a likelihood of success on the merits of breach claims, and really those claims were admitted by the 777 parties, the borrowers and the guarantors. And what was that breach here? It was entering into a contract and saying that you have $600 million of security that you're holding free and clear of adverse interests and not having that. So whether the court construes that also to give rise to fraud, we think that the district court will answer that question in the affirmative, but that's not before this Court today. The breach here is indisputably linked to what happened to the collateral, where did it go, and what obligations do the borrowers and guarantors have to hold that collateral. And this is a very reasonable, restrictive preliminary injunction. It has a normal course of business exception. It allows the borrowers and the guarantors to continue doing business. It doesn't purport to dispose of the assets that are being enjoined. It doesn't purport to make any determination as to who has first priority to those assets in the event that Ledenhall does obtain a judgment. All it does is what Grupo Mexicano and its progeny like Gucci allow, which is to provide a reasonable measure to enjoin assets with a nexus to Ledenhall's equitable relief and equitable claims in order to preserve the status quo so that these assets don't go out the door during the pendency of this case. Kind of an odd question. Did the district court ever – I gather there was no written opinion in this case. Hundreds of millions of dollars involved, but Judge Codall never wrote what we would recognize as an opinion and so on and so forth. Did he ever explain why or do you know why? He did not explain why, but he did read approximately a 20-page opinion from the bench and so there certainly was consideration behind his ruling. It may have been just the celerity of the proceedings. This was originally a temporary restraining order, but there was plenty of time for briefing and for the court's consideration on the injunction. I don't doubt that. I just wonder whether from across the street he's talking. The court did not explain why he decided to read his opinion from the bench rather than issuing a written opinion, but this was briefed three times on the TRO, the PI, and then the motion to modify the PI, and there's a lot of authority that is cited in Judge Codall's opinion. He took into account Grupo Mexicano three times and explained why it doesn't apply here. His reasoning was consistent with prior decisions of this court that say where there's an equitable interest that needs to be preserved, again, only pending the litigation. This isn't saying these assets are Leadenhalls and not ACAPs. They'll have a chance to make that argument, but what it is saying is Leadenhall has a security interest in having $609 million worth of security there for it while it is litigating its claims. That obligation was both the borrower's and the guarantor's obligation, and the injunction is a reasonable measure to preserve the status quo. Again, the Gucci case specifically noted that a move-in for a preliminary injunction of this type need not identify the specific assets that are going to be enjoined because that is not a prerequisite for this type of relief. It's interim relief. And here, again, as Judge Merriam pointed out, the collateral that is meant to be in the facility and available to Leadenhall is not identified as these five specific assets. We did, I would note, do a deep dive into the historical jurisdiction of the courts of equity on this point, and I raise it because Mr. Watkins noted that a bond creditor was out of luck if the real estate was absconded with, but there is a treatise from 1867 about the bounds of the courts of equity. It's by William Kerr. A hundred years too late. A hundred years too late, but discussing the historical background of the English courts of chancery and how we got to where we are, and notes that there is a situation where a mortgagor is obligated not to waste assets if the property securing the mortgage, in other words, the property on which the mortgage is taken out, is destroyed or dissipated. That's a very similar situation to what we have here, and my colleagues will not have an answer for you as to what a secured creditor like Leadenhall has recourse to do in a situation where the allegation, and again, this is not a fraud allegation. It may give rise to fraud, but it is a breach of contract allegation, and it's not disputed that the borrowers and guarantors either made up the existence of the security, lied about the existence of the security, or absconded with the security. It can't be the case, and Grupo Mexicano and none of the other cases cited by ACAP or the 777 defendants support that a party can transform or eviscerate a security interest or another equitable interest simply by absconding with the security, and this injunction is designed specifically to avoid that circumstance. So I want to ask the same question that I asked your colleague about the guarantors' frozen assets at issues. Are any proceeds from the collateral held by borrowers? Held by guarantors? Were any of the guarantors' frozen assets at issues proceeds from the collateral held by borrowers? Our position is absolutely yes. That money went somewhere. It didn't go to the purchase of security that was meant to secure the investment. There are many allegations in the complaint, both the original and the amended complaint, about what the borrowers and the guarantors did with this, and we know that based on representations of their counsel that the guarantors don't have $600 million worth of assets at this point either. So again, there have already been dissipations of funds. There's really not a dispute as to that. There were admissions two days before our lawsuit was filed that the defendants were running down the business and getting rid of all the remaining assets, and that gave rise to our request for relief here. So absolutely, whatever assets the borrowers and the guarantors have are proceeds of the conduct that is alleged here, and that is exactly why the equitable solution is, again, what the court did, a reasonable measure to protect those assets. It's also worth noting here that the preliminary injunction is staged. It enjoins the assets of the guarantors only if the collateral itself is not there. In other words, whatever collateral the borrowers had in their discretion earmarked as collateral, if that is not there, then you look to the other assets of the borrowers, which the contract gives Lettenhall an entitlement to the equity in. Only if those assets do not make up $609 million worth do you go to the guarantors' assets based on their relatively unusual but not unprecedented performance guarantee, where they step into the shoes of the borrowers and say, we will voluntarily take on the responsibility of making sure that there is enough collateral there for you. So the prayer for equitable relief, again, that exists in both complaints, includes the obligation for the parties to the contracts, the borrowers and the guarantors, to uphold that performance obligation. If at the end of this case that obligation is granted, the borrowers and the guarantors will have to use whatever assets they have to purchase collateral, purchase security, and put it into that facility for Lettenhall. And this injunction is in aid of that goal. Thank you so much. Thank you. Mr. Watkins, you've got two minutes. Thank you, Your Honor. Addressing various points, we've heard much about absconding with collateral. There have been questions about where the collateral is. The only allegations in the complaint about where collateral went is that it was double-pledged by being transferred to a loan facility of Intervenor National founders. Lettenhall could have moved for fraudulent transfer, could have initiated proceeding about, hey, are we first, are they first, let's figure this out under the UCC. They didn't do that. There's no such claim, nor is there any claim for absconding with collateral elsewhere, including to borrowers. Borrowers' assets are actually the collateral of Advantage Capital. Advantage Capital has the first lien on those assets. Advantage Capital has filed UCCs on those assets. The point of UCCs is to put the world on notice that those are your assets, those are your collateral. Lettenhall was on notice. That's Advantage Capital's collateral, the assets of the guarantors, not Lettenhall's. The argument of Lettenhall here would turn secure lending on its head. They filed UCCs about the extent of their security interest. Expanding it to another whole group of entities, another whole group of an international conglomerate, would be unprecedented. There have been many comments about, well, Gucci said that you don't need to identify particular assets. Yes, you do. Gucci dealt with a Lanhamath accounting of profits case. There are two exceptions to the rule that you need to identify particular assets, statutory relief and accounting of profits. That's what all of the cases say. Every other case has required particular assets, as Judge Sullivan ruled in Professional Merchant Advance. The only potential exception to the rule laid down in Grupo Mexicano is when a party ultimately seeks equitable relief involving a specific asset. A prayer to enjoin further violations of contract as Great West Life held, as this court held in an opinion authored by Judge Sack, the Cohen opinion. That is not equitable relief as to any particular asset. It is... Wrap up your last sentence. Maybe I have to correct my... Why is ACAP leading the charge here? ACAP's leading the charge here because the collateral at issue, the collateral that's frozen, is ACAP's collateral. ACAP has a first lien on all of that collateral. And this preliminary injunction has chilled ACAP's ability to maximize the value of its collateral for the benefit of everyone. For ACAP's benefit, for the guarantor's benefit, and ultimately for Levinhall's benefit, if that means that money is getting back into the system and getting back to guarantors. But working out deals, maximizing the value of those assets is impossible if these assets that are the subject of ACAP's security, ACAP's UCCs and not Levinhall's, are frozen to give equitable assistance in the aid of collecting a legal debt. Exactly what the Supreme Court has forbidden. Thank you so much. This was very helpfully argued. We will take this case under advisement.